**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| MICHAEL KNOX, | ) | CASE NO:    1:09-CV-1573 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **AND ORDER** |

Plaintiff, Michael Knox, challenges the final decision of Defendant, Michael J.

Astrue, Commissioner of Social Security (the "Commissioner"), denying Plaintiff's

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* (the "Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to the consent of the parties entered under the authority of

28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Court AFFIRMS the final decision of the

Commissioner.

# I.   PROCEDURAL HISTORY

On January 31, 2006, Plaintiff filed applications for DIB and SSI alleging a disability onset date of September 3, 2003.  (Tr. 12.)  The applications were denied initially and upon reconsideration.  (Tr. 12.)  Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 12.)

On October 23, 2008, an ALJ held Plaintiff's hearing.  (Tr. 12.)  Plaintiff was represented by counsel, and a vocational expert ("VE") testified along with Plaintiff.  (Tr. 12.)  At the hearing, Plaintiff amended his alleged disability onset date to April 30, 2007. (Tr. 12, 453.)  On January 29, 2009, the ALJ found Plaintiff not disabled.  (Tr. 21.)

On June 10, 2009, the Appeals Council declined to review the ALJ's decision; therefore, the ALJ's decision became the Commissioner's final decision.  (Tr. 2.)  On July 9, 2009, Plaintiff timely filed this action in the District Court for the Northern District of Ohio.  (Doc. No. 1.)

Plaintiff asserts three assignments of error: (1) the ALJ erred by finding that Plaintiff's carpal tunnel syndrome was not a severe impairment; (2) the ALJ erred by failing to give adequate "good reasons" for the weight he gave to Plaintiff's treating physician; and (3) the ALJ erred in his residual functional capacity ("RFC") assessment because substantial evidence supports a more restrictive RFC.

# II.   EVIDENCE

## A.      Personal and Vocational Evidence

Plaintiff was fifty-one years old at the time of his hearing.  He did not graduate from high school and completed the Tenth Grade.  (Tr. 456.)  Plaintiff's past relevant

2

work experience includes tow motor operator, steel shear operator, material handler, and packager.  (Tr. 469-70.)

###### B.    Medical Evidence

At his administrative hearing in October 2008, Plaintiff testified that he had bilateral shoulder problems, carpal tunnel syndrome in the left hand, neck problems, low back pain, liver disease, cysts on his left foot, and depression.  (Tr. 454-55, 457-59, 462-64.)  In his brief, however, Plaintiff takes issue with the ALJ's evaluation of only his shoulder problems and carpal tunnel syndrome.  Therefore, the Court's recitation of Plaintiff's medical history will focus on those impairments.

###### 1.    Plaintiff's Shoulders

On February 6, 2007, Plaintiff presented to Dr. Robert M. Coale to follow up on a left shoulder rotator cuff tear and right shoulder pain.  (Tr. 212.)  An MRI of Plaintiff's left shoulder indicated a tear in Plaintiff's rotator cuff, and a thickening of the subacromial subdeltoid bursa that was consistent with bursitis and synovitis.  (Tr. 212.)  As to Plaintiff's problems with his right shoulder, such problems apparently began around January 2007.[1]  (*See* Tr. 212.)  Dr. Coale diagnosed Plaintiff with a sprain of the supraspinatus muscle/tendon (Tr. 213), indicated that Plaintiff's pain in the right shoulder was consistent with a rotator cuff pathology (Tr. 212), and indicated that Plaintiff's right shoulder symptoms were far worse than Plaintiff's left shoulder.  (Tr. 212.)

---

[1] Dr. Coale indicated that Plaintiff had obtained an injection in his right shoulder "years ago" that provided "complete relief" to the right shoulder until the present follow-up evaluation.  (Tr. 212.)

3

Dr. Coale also indicated that, although Plaintiff had been scheduled for surgery on the left rotator cuff, that surgery had been cancelled because of other medical problems.  (Tr. 212.)  Dr. Coale observed, however, that Plaintiff's left shoulder was "clinically much improved," although Plaintiff continued to report pain.  Dr. Coale opined that the rotator cuff tear might have retracted significantly, which might have made operative intervention unnecessary.  (Tr. 212.)  Dr. Coale instructed Plaintiff to continue his home exercise program.  (Tr. 212.)

On February 27, 2007, Dr. Robert J. Gillespie examined Plaintiff and indicated that an MRI of Plaintiff's right shoulder did not indicate a tear in the rotor cuff.  (Tr. 214.)

On March 19, 2007, Plaintiff was examined by resident Dr. Erik Kuyn for a follow-up on Plaintiff shoulder pain.  (Tr. 216.)  Dr. Kuyn assessed Plaintiff as a forty-nine year-old "with chronic left and right shoulder pain secondary to rotator cuff tears awaiting surgery."  (Tr. 216.)  However, Dr. Kuyn indicated that Plaintiff retained intact strength, sensation, and reflexes.  (Tr. 216.)

On March 27, 2007, attending physician Dr. Daniel Malkamaki followed-up on Dr. Kuyn's assessment and indicated that Plaintiff's right shoulder was "worse than the left." (Tr. 217.)  Dr. Malkamaki also indicated that Plaintiff was not performing his home exercise regimen as often as he should have been, as Dr. Malkamaki indicated that Plaintiff's doctors "really encouraged him that he needs to stay diligent with the rehabilitation."

On April 3, 2007, Plaintiff presented to Dr. Sean R. Waldron for a follow-up of his left and right shoulder pain.  (Tr. 219.)  Dr. Waldron indicated that Plaintiff still had not undergone surgery for his left shoulder because of other medical problems, but

4

Plaintiff's left shoulder showed "much improvement" with physical therapy.  (Tr. 219.)

Dr. Waldron further indicated that, although an MRI of Plaintiff's right shoulder did not

show a rotator cuff tear, Plaintiff's right shoulder bothered Plaintiff more than the left

shoulder.  (Tr. 219.)  Although Dr. Waldron recommended that Plaintiff continue

physical therapy to increase strength and range of motion in his shoulders, Dr. Waldron

indicated that Plaintiff was "OK to lift any amount of weight as tolerated with either arm."

(Tr. 219.)

On May 14, 2007, Dr. Kuyn indicated that Plaintiff's physicians decided to treat

Plaintiff's shoulder problems with physical therapy rather than surgery.  (Tr. 221.)  Dr.

Kuyn further indicated that Plaintiff had a full range of motion in both shoulders, and that

Plaintiff "reports doing very well with improved pain and function."  (Tr. 221.)

On August 20, 2007, Dr. Kuyn saw Plaintiff for follow-up and indicated that

Plaintiff reported missing a few physical therapy sessions, although Plaintiff also

reported that he continued his home exercise program four to five times a week.  (Tr.

240.)  Dr. Kuyn further indicated that Plaintiff's range of motion had decreased since his

last visit, that Plaintiff could abduct his left shoulder to 150 degrees, and that Plaintiff

could flex his left shoulder to 160 degrees.  (Tr. 240.)  Dr. Kuyn recommended that

Plaintiff continue to perform his home exercise program.  (Tr. 240.)

On December 3, 2007, Plaintiff presented to Dr. Kuyn for follow-up with

complaints of increased pain in his left shoulder.  (Tr. 243.)  Dr. Kuyn indicated that

Plaintiff had decreased range of motion in both shoulders, and that Plaintiff reported that

he still was not doing his home exercise program as often as he should.  (Tr. 243.)  Dr.

Kuyn reported that Plaintiff could abduct his left shoulder to 150 degrees and flex his left

shoulder to 160 degrees.  (Tr. 243.)  Dr. Kuyn gave Plaintiff a subacromial injection in his left shoulder for the pain and encouraged Plaintiff to continue his home exercise program.  (Tr. 243-44.)

On June 2, 2008, Plaintiff presented to Dr. Kuyn with complaints of  increased pain in his left shoulder and numbness in his left hand.  (Tr. 197.)  Dr. Kuyn indicated that, since Plaintiff's last visit on January 21, 2008, Plaintiff had been diagnosed with carpal tunnel syndrome in his left hand.  (Tr. 197.)  Dr. Kuyn further indicated that Plaintiff reported he could no longer perform his home exercise program, and that he could not sleep because of his shoulder pain.  (Tr. 197.)  However, Dr. Kuyn also indicated that Plaintiff could abduct and forward flex his left shoulder fully.  (Tr. 197.)  Dr. Kuyn recommended that Plaintiff see his other physician to get clearance for surgery on his left shoulder.  (Tr. 198.)

On October 13, 2008, Plaintiff presented to Dr. Kamaljit Sidhu for a follow-up of his left shoulder and hand numbness.  (Tr. 172.)  Dr. Sidhu indicated that Plaintiff reported his pain in his left shoulder at a pain level of four or five out of ten in severity (Tr. 172) and suffered giveway weakness in his left deltoid (Tr. 173), but could abduct and forward-flex his left shoulder to ninety degrees (Tr. 172).  Dr. Sidhu further indicated that Plaintiff would undergo another MRI of his left shoulder in preparation for surgery. (Tr. 173.)

On November 26, 2008, Dr. John H. Wilber performed left subacromial decompression and rotator cuff repair surgery on Plaintiff's left shoulder.  (Tr. 145.)  The record contains no follow-up records of Plaintiff's surgery.

### 2.      Plaintiff's Carpal Tunnel Syndrome

On December 11, 2007, Plaintiff presented to Dr. Mathew H. Evenhouse at an emergency department with a complaint of swelling in his left hand.  (Tr. 249.)  There was no known cause for the swelling, but Plaintiff reported that, since a recent injection into his left shoulder, his hand felt swollen, tight, and difficult to close.  (Tr. 249.)  Dr. Evenhouse also indicated that Plaintiff reported he had fallen on his hand a month prior but never obtained x-rays of it, and that Plaintiff made no complaints of other medical problems at this time.  (Tr. 249.)  Dr. Evenhouse assessed Plaintiff with a contusion of the left hand.  (Tr. 250.)

Three days later, on December 14, 2007, Plaintiff presented to Ms. Kimberly M. Tranter, nurse practitioner, at the emergency department.  (Tr. 252.)  Ms. Tranter indicated that Plaintiff complained of numbness, tingling, and pain in his left hand.  (Tr. 255.)  Ms. Tranter assessed Plaintiff with carpal tunnel syndrome in his left hand.  (Tr. 256.)

On January 8, 2008, Plaintiff presented to Dr. Andrew S. Islam with complaints of pain in his shoulders and left hand.  (Tr. 258.)  Dr. Islam indicated that Plaintiff reported that the main problem was the pain in his left hand.  (Tr. 258.)  Dr. Islam tested Plaintiff for carpal tunnel syndrome and indicated that Plaintiff's exam was "confusing" and not entirely clear about whether Plaintiff suffered carpal tunnel syndrome or problems with his cervical spine.  (Tr. 258)  Therefore, Dr. Islam indicated that he would refer Plaintiff for an MRI of either his hand or spine to determine the cause of the pain in his hand. (Tr. 258.)

On February 5, 2008, Plaintiff presented to Dr. Michael R. Chen to follow-up on

his left hand pain.  (Tr. 282-84.)  Dr. Chen reported that an EMG of Plaintiff's hand indicated mild carpal tunnel syndrome.  (Tr. 283.)  Dr. Chen indicated that Plaintiff had been discharged from physical therapy because he failed to participate in it.  (Tr. 283.)  Mr. Chad Fortun, a medical student overseen by Dr. Chen and who also evaluated Plaintiff at this time, indicated that Plaintiff reported that his wrist splint provided "some relief" of his left hand pain during the night.  (Tr. 282.)

On February 11, 2008, Plaintiff presented to Dr. Kevin J. Malone and Dr. Chidubem Orazulike to determine whether he needed surgery for his left hand.  (Tr. 285.)  Both doctors indicated that Plaintiff would be given steroid injections for the time being, and that they would follow-up in six weeks to determine whether surgery was appropriate.  (Tr. 285, 286.)

On March 24, 2008, Plaintiff presented to Dr. Jon B. Smucker to follow-up on his carpal tunnel syndrome.  (Tr. 288.)  Dr. Smucker indicated that, although the steroid injection Plaintiff obtained at his last visit provided no relief from pain for the first week after the injection, Plaintiff subsequently enjoyed "steadily improving pain."  (Tr. 288.)  Dr. Smucker further indicated that Plaintiff reported all the pain and tingling in his left had was gone, and that he was happy with the results of the steroid injection.  (Tr. 288.)

On June 6, 2008, Plaintiff presented to Dr. Erik Kuyn to follow up on his shoulder and left hand pain.  (Tr. 197.)  Dr. Kuyn noted that, since his last visit, Plaintiff "had his carpal tunnel injected with good results."  (Tr. 197.)

On October 13, 2008, Plaintiff presented to Dr. Kamaljit Sidhu to follow up on his shoulder and left hand pain.  (Tr. 172.)  Dr. Sidhu indicated that Plaintiff reported that his carpal tunnel syndrome was "tolerable."  (Tr. 172.)

8

### 3.    Plaintiff's Medical Source Statements

On January 9, 2006, Plaintiff's treating physician, Dr. Govil Harsh, submitted a letter to the Cuyahoga County Department of Job and Family Services and reported the following.  Plaintiff suffered bilateral "shoulder problems and is not allowed to do repetitive work activities."  (Tr. 342.)  Plaintiff also "is allowed lifting no more than 5 pounds occasionally and no overhead activities."  (Tr. 342.)

On July 27, 2006, state agency reviewing physician Dr. Gary Hinzman reviewed the record and determined that Plaintiff had the following physical RFC.  Plaintiff could occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; and stand, sit, and walk about six hours in an eight-hour workday.  (Tr. 348.)  Plaintiff's ability to push and pull was limited in his arms because of his shoulder problems.  (Tr. 348.)  Plaintiff was limited in his ability to reach in all directions and could not perform overhead reaching and handling.  (Tr. 350.)  Plaintiff could perform gross and fine manipulation, however, and his sense of touch was intact.  (Tr. 350.)  Plaintiff suffered no postural limitations (Tr. 349), visual limitations (Tr. 350), communicative limitations (Tr. 351), or environmental limitations (Tr. 351).

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified at his hearing as follows.  Plaintiff has bilateral shoulder problems, carpal tunnel syndrome in the left hand, neck problems, low back pain, liver disease, cysts on his left foot, and depression.  (Tr. 454-55, 457-59, 463-64.) Plaintiff's liver disease sometimes causes tightness in his abdomen, which makes it difficult for him to bend over without pain.  (Tr. 462.)  Furthermore, Plaintiff is easily

9

agitated and sometimes becomes withdrawn, as he is depressed about his present condition.  (Tr. 463-64.)

Plaintiff has trouble sitting for extended periods of time because his lower back will begin to hurt, and he is able to sleep for only two hours at a time.  (Tr. 459.) However, although Plaintiff's pain rates at four or five out of ten in severity daily, he "can bear it."  (Tr. 456-57.)  Moreover, although Plaintiff suffers carpal tunnel syndrome in his left hand, his right hand is "all right."  (Tr. 459.)

Plaintiff is supposed to perform home exercise activities every day, but Plaintiff performs his home exercise program every other day, or once every few days, because sometimes the stiffness in his shoulders makes such exercises too difficult.  (Tr. 461.) Plaintiff's physicians will not increase Plaintiff's pain medications further because Plaintiff has liver disease.  (Tr. 456.)

Plaintiff lives with his sister.  (Tr. 460.)  Plaintiff is not able to do household chores such as vacuuming because such activities would hurt his shoulders.  (Tr. 460.) Although he can make his bed by pulling the bed coverings over the bed, he is not able to tuck the sheets into the mattress.  (Tr. 460.)  Although Plaintiff lost his driver's license, if he were allowed to drive he would not be able to do it.  (Tr. 460.)  Plaintiff cannot do the laundry.  (Tr. 4561.)  He cannot make small repairs around the house such as replacing a broken light bulb in any overhead light fixtures because he cannot reach his arms above his head.  (Tr. 461.)

Plaintiff's girlfriend helps Plaintiff with some aspects of personal grooming because Plaintiff cannot reach above his head or around his back.  (Tr. 461.)

10

### 2.      Vocational Expert's Testimony

The ALJ posed the following hypothetical individual to the VE:

Hypothetical worker is 51 years old, has an eleventh grade education and no
formal vocational training . . . .  This hypothetical worker can sit, stand or
walk for six hours each during an eight hour day.  However he is . . . limited
to lifting a maximum of ten pounds.  Also to pushing and pulling a maximum
of ten pounds.  The hypothetical worker is precluded from work above
shoulder level bilaterally.  He is precluded from using ladders, ropes and
scaffolds.  He is also precluded from crawling.  Finally, the hypothetical
worker is limited to superficial interaction with supervisors, coworkers and the
public.

(Tr. 470-71.)  The VE testified that such a person could not perform Plaintiff's past

relevant work and would be precluded from performing a full range of light work.  (Tr.

471.)

The ALJ then asked the VE whether such a hypothetical person with Plaintiff's

age, education, work experience, and limitations could perform any other work that

exists in the national or regional economy, and that constitutes light work.  (Tr. 471.)

Using the Dictionary of Occupational Titles as a reference, the VE testified that such a

person could perform work as a cashier (10,000 positions in northeast Ohio, 35,000 in

Ohio, and 800,000 nationally), photo copy machine operator (750 positions in northeast

Ohio, 1,600 in Ohio, and 46,000 nationally), and mail clerk (450 positions in northeast

Ohio, 1,700 in Ohio, and 40,000 nationally).[2]  (Tr. 471-73.)

Plaintiff's attorney modified the ALJ's hypothetical to include the limitation that

the hypothetical person, being right-hand-dominant, could use his left hand only to

---

[2] The VE was concerned that such jobs might require lifting more than ten
pounds, so he reduced an original number of positions of each job by fifty
percent to obtain the number of positions to which he testified.  (Tr. 472-73.)

11

assist the right hand.  (Tr. 474.)  The VE testified that such a limitation would not prevent such a person from performing the jobs to which the VE testified.  (Tr. 474.)

Plaintiff's attorney modified the ALJ's hypothetical further to include the limitation that the hypothetical person could bend only rarely.  (Tr. 474.)  The VE testified that such a limitation would not prevent such a person from performing the jobs to which the VE testified.  (Tr. 475.)

Plaintiff's attorney then modified the ALJ's hypothetical by including the limitation that such a hypothetical person, being right-hand-dominant, could never use his left hand except to guide the right hand.  (Tr. 476.)  The VE testified that such a limitation would not preclude such a person from performing the jobs to which the VE testified. (Tr. 476-77.)

Finally, Plaintiff's attorney modified the ALJ's hypothetical by including the limitation that the hypothetical person would be off task twenty percent of the scheduled work day.  (Tr. 477.)  The VE testified that such a person would not be able to perform any work in the regional, state, or national economies.  (Tr. 477.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

12

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled

by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott*

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that

she is not currently engaged in "substantial gainful activity" at the time she seeks

disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant

must show that she suffers from a "severe impairment" in order to warrant a finding of

disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a

severe impairment that is expected to last for at least twelve months, and the

impairment meets a listed impairment, the claimant is presumed to be disabled

regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      Mr. Knox met the insured status requirements of the Social Security

Act through September 30 [sic], 2008.

2.    Mr. Knox has not engaged in substantial gainful activity since September 3, 2003, the alleged onset date.

3.    Mr. Knox has the following severe impairments:  left rotator cuff tear after surgery in November 2008 . . . right shoulder tendonitis and synovitis . . . cervical degenerative disc disease with spinal and foraminal narrowing . . . a depressive disorder . . . and a substance addiction disorder.

4.    Mr. Knox does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    Mr. Knox retains the residual functional capacity to perform a reduced range light work . . . .  Specifically, he can lift, carry , push and/or pull a maximum of 10 pounds and can sit, stand, and/or walk for 6 hours each in an 8-hour workday.  He is precluded from overhead reaching. He cannot crawl and he cannot use ladder, ropes or scaffolds.  He is limited to tasks that involve only superficial interaction with supervisors, coworkers, and the general public.

6.    Mr. Knox is unable to perform any past relevant work.

. . . . .

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Mr. Knox is "not disabled," whether or not he has transferrable job skills.

10.    Considering Mr. Knox's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

11.    Mr. Knox has not been under a disability, as defined by the Social Security Act, from September 3, 2003[,] through the date of this decision.

(Tr. 14-21.)

14

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    The ALJ's Determination of Severe Impairments

Plaintiff argues that the ALJ erred because he did not find that Plaintiff's carpal tunnel syndrome was a severe impairment at the second step of his disability analysis.

15

The Court finds that the ALJ's determination that Plaintiff's carpal tunnel syndrome was not a severe impairment is supported by substantial evidence and is, therefore, not erroneous.  Furthermore, even if the ALJ had erred in determining that Plaintiff's carpal tunnel syndrome was not a severe impairment, such a determination would be, at most, harmless error.

The ALJ explained that Plaintiff's carpal tunnel syndrome was not severe because Plaintiff had obtained some relief of his carpal tunnel pain when he wore a wrist splint at night; Dr. Smucker reported on March 24, 2008, that Plaintiff's left-hand pain had been entirely eliminated with injection treatments; and Dr. Kuyn reported on June 6, 2008, that injection treatments provided Plaintiff "good relief" from his left-hand pain.  (Tr. 15.)  Plaintiff contends, however, that substantial evidence supports the conclusion that Plaintiff's left-hand carpal tunnel syndrome is severe; that the evidence does not demonstrate that Plaintiff's wrist splint provided *substantial* improvement of Plaintiff's condition; that, although the evidence indicates that injection treatments improved Plaintiff's carpal tunnel syndrome, the treatments did not "resolve the cause of Mr. Knox's pain"; and that Plaintiff testified that his doctors told him that they were waiting to see the extent of relief that Plaintiff obtained from his injection treatments before considering whether Plaintiff should undergo surgery.  (Pl.'s Br. 4-5.)

Plaintiff arguments are based on incorrect legal standards.  The evidence upon which the ALJ based his determination that Plaintiff's carpal tunnel syndrome was not severe is more than a scintilla of evidence upon which a reasonable mind could conclude that Plaintiff's carpal tunnel syndrome was not severe; that is, the ALJ's determination that Plaintiff's carpal tunnel syndrome was not severe is supported by

16

substantial evidence.  Plaintiff's contention that substantial evidence supports the conclusion that his carpal tunnel syndrome *was* severe is beside the point, as a determination supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  Therefore, this argument lacks merit.

Furthermore, Plaintiff's contention that his treatments did not solve the cause of his carpal tunnel syndrome pain is also beside the point, as it is premised on the idea that the existence of a carpal tunnel syndrome impairment supports the conclusion that the carpal tunnel syndrome is severe.  However, merely having an impairment says nothing about the severity of that impairment.  *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988).  Therefore, this argument lacks merit.

Finally, even if the ALJ erred in determining that Plaintiff's carpal tunnel syndrome was not severe, such error would be, at most, harmless and not a basis for remand.  The determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  The goal of the test is to screen out totally groundless claims.  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once the ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two would be only harmless error.  *Anthony*, 266 F. App'x at 457 (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).  However, all of a claimant's impairments, severe and not severe, must be considered at every

17

subsequent step of the sequential evaluation process.  *See* C.F.R. § 404.1529(d);

C.F.R. §§ 416.920(d).

Here, the ALJ found that Plaintiff suffered the following severe impairments at

step two of his analysis:  left rotator cuff tear, right shoulder tendonitis and synovitis,

cervical degenerative disc disease with spinal and foraminal narrowing, a depressive

disorder, and a substance addiction disorder.  Upon these findings, Plaintiff cleared step

two of the analysis.  *See Anthony*, 266 F. App'x at 457.  The fact that Plaintiff's carpal

tunnel syndrome was not deemed a severe impairment would be, at most, harmless

error and would not be a basis for remand.  *See id.* (citing *Maziars*, 837 F.2d at 244).

### C.    Good Reasons for Discrediting a Treating Physician's Opinions

The Social Security regulations contain a clear procedural requirement:  "We will

always give good reasons in our notice of determination or decision for the weight we

give [a claimant's] treating source's opinion."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).  Pursuant to this

procedural requirement, a decision denying benefits "must contain specific reasons for

the weight given to the treating source's medical opinion, supported by the evidence in

the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and

the reasons for that weight."  S.S.R. 96-2p, 1996 WL 374188, at *5 (1996).  Plaintiff

argues that the ALJ did not give good reasons for rejecting his treating physician, Dr.

Govil's, opinions.  For the reasons set forth below, the Court finds that the ALJ gave

adequate good reasons for giving less weight to Dr. Govil's opinions and, even if one

assumes that the ALJ failed to give adequate good reasons, such a failure would be, at

most, harmless error.

Dr. Govil opined in a three-sentence letter that Plaintiff suffered bilateral shoulder problems, was "not allowed to do repetitive work activities," and "is allowed lifting no more than 5 pounds occasionally and no overhead activities."  (Tr. 342.)  The ALJ found that the record evidence supported Dr. Govil's opinion that Plaintiff should not perform overhead lifting, but that "there is no support for a limitation on 'repetitive work activities' or lifting only five pounds, especially in light of Mr. Knox's wide range of daily activities." (Tr. 18.)  Plaintiff argues that this basis for rejecting Dr. Govil's opinions was inadequate, particularly because "Nowhere in the decision does the ALJ explain how Mr. Knox's daily activities indicate that he has the ability to meet the daily demands of a job requiring repetitive actions or more than occasional lifting of over 5 pounds."  (Pl.'s Br. 6.)  The Court disagrees.

In order for the treating physician's opinion to be entitled to substantial weight, the opinion must be more than a conclusory statement and must be supported by clinical or diagnostic findings.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981).  If the treating physician's opinions are not supported by underlying clinical or diagnostic findings, the ALJ may choose to disregard the treating physician's opinions.  *See Landsaw v. Secretary of Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).  Here, the ALJ explained that there was no support for Dr. Govil's opinions that Plaintiff should not perform repetitive work activities or lift more than five pounds occasionally.  A review of Dr. Govil's letter indicates that the ALJ's analysis is accurate, as Dr. Govil provided no explanation for his limitations. Furthermore, Plaintiff has not cited, and the Court has not found, any medical evidence

19

in the record that directly supports Dr. Govil's opinions.  In contrast, the ALJ explained Plaintiff's daily activities as reported in Plaintiff's disability applications and found that those daily activities were inconsistent with Dr. Govil's opinions.  (Tr. 18.)  Those daily activities include performing self-care, preparing simple meals, performing household chores, grocery shopping, taking care of his nephew, and helping his wife when she broke her ribs.  (Tr. 18.)  These daily activities, in combination with the observation that Dr. Govil's opinions are unsupported, constitute more than a scintilla of evidence upon which a reasonable mind could conclude that Plaintiff was not incapable of performing repetitive wok activities and lift more than five pounds.

Plaintiff argues that the ALJ did not adequately explain *how* Plaintiff's daily activities support the conclusion that Plaintiff could perform repetitive work activities and lift more than five pounds.  However, Plaintiff does not cite, and the Court is unaware of, legal authority that requires an ALJ to describe in greater detail how a Plaintiff's daily activities precisely support the conclusion that a claimant is not disabled or otherwise limited contrary to the ALJ's determination.  Therefore, this argument lacks merit.

Although the ALJ's explanation for the weight he gave to Dr. Govil's opinions is brief, it is supported by substantial evidence and is sufficiently clear to understand the weight the ALJ gave to Dr. Govil's opinions; therefore, the ALJ's explanation of the weight he gave to Dr. Govil's opinions constitutes an adequate good reason.  However, even if the ALJ's explanation were not an adequate good reason for giving Dr. Govil's opinions less weight, such an error would be harmless and not a basis for remand.

Courts have recognized that "It is an elemental principle of administrative law that agencies are bound to follow their own regulations.  *Wilson v. Comm'r of Soc. Sec.*, 378

20

F.3d 541, 545 (6th Cir. 2004); *see also* 5 U.S.C. § 706(2)(D) ("The reviewing court shall

. . . hold unlawful and set aside agency action . . . found to be . . . without observance of

procedure required by law."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the

rights of individuals are affected, it is incumbent upon agencies to follow their own

procedures.").  Generally, however, courts review the decisions of administrative

agencies for harmless error. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th

Cir. 2001); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that

courts are not required to "convert judicial review of agency action into a ping-pong

game" where "remand would be an idle and useless formality").  Accordingly, if an

agency has failed to adhere to its own procedures, courts will not remand for further

administrative proceedings unless "the claimant has been prejudiced on the merits or

deprived of substantial rights because of the agency's procedural lapses."  *Connor v.

U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also Am. Farm Lines

v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (holding that agency's failure to

follow its own regulations did not require reversal absent a showing of substantial

prejudice by the affected party).  The "good reasons" procedural requirement of 20

C.F.R. § 1527(d)(2) is a substantial right for Social Security disability claimants.  *See

Wilson*, 378 F.3d at 547.  However, the Sixth Circuit has contemplated that, "if a treating

source's opinion is so patently deficient that the Commissioner could not possibly credit

it, a failure to observe § 1527(d)(2) may not warrant reversal."  *Wilson*, 378 F.3d at 547.

Here, a failure to give good reasons for giving Dr. Govil's opinions less weight

would constitute harmless error because Dr. Govil's opinions are patently deficient.  Dr.

Govils opinions are articulated in a three-sentence paragraph that provides no objective

21

diagnostic bases and has no apparent, direct support from the other medical evidence. Furthermore, Dr. Govil does not opine that Plaintiff *could not* perform repetitive work activities and lift more than five pounds occasionally; rather, Dr. Govil opines that Plaintiff *should not* do such activities.  These opinions do not speak of actual functional limitations on Plaintiff's ability to work.  In other words, Dr. Govil did not present a clear opinion upon which the ALJ could rely.  Therefore, even if the ALJ erred by failing to state an adequate good reason for giving Dr. Govil's opinions less weight, remand would be inappropriate.

> **D.      The ALJ's RFC Assessment**

Plaintiff argues that the ALJ's RFC assessment is erroneous because substantial evidence actually supports the conclusion that Plaintiff is more limited and possibly disabled.  Again, Plaintiff argues the incorrect legal standard.  Plaintiff's contention that substantial evidence supports a more limited RFC is beside the point, as a determination supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  Plaintiff fails to explain how the record evidence cited by the ALJ does not constitute substantial evidence in support of the ALJ's RFC assessment.[3]  Therefore, this assignment of error lacks merit.

---

[3] Plaintiff contends that the ALJ's observation that Plaintiff "was able to take care of the house when his wife broke her ribs" was inaccurate, as the evidence to which the ALJ cited indicated only that Plaintiff "had to help [his wife] a lot more."  (Pl.'s Br. 9.)  Although the ALJ may have mis-stated this aspect of the evidence, this observation does not lead to the conclusion that the ALJ's RFC assessment is not supported by substantial evidence in the record as a whole.

## VI.    CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED, and judgment is entered in favor of the Commissioner.

**IT IS SO ORDERED**.

_s/ Nancy A. Vecchiarelli_
Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: March 9, 2011